

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

- against -

**AAMER ABDULLAH,**

**Defendant.**

---

No. 10 Civ. _____

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendant Aamer Abdullah ("Abdullah"), alleges as follows:

### SUMMARY OF ALLEGATIONS

1.       The Commission brings this action against Defendant Abdullah for violations of the federal securities laws. Abdullah was a portfolio manager at ICP Asset Management, LLC ("ICP"), which managed several investment vehicles, including four multi-billion-dollar collateralized debt obligations, known as the Triaxx CDOs, whose assets primarily consisted of mortgage-backed bonds. Starting in 2007, as the mortgage markets deteriorated, Abdullah — together with ICP, its owner and president, Thomas Priore ("Priore"), its affiliated broker-dealer, ICP Securities, LLC ("ICPS"), and its holding company — engaged in improper transactions that defrauded the Triaxx CDOs of tens of millions of dollars and placed them at risk of substantial additional losses in the future.

### SECURITIES LAWS VIOLATIONS

2.       By virtue of the conduct alleged herein, Abdullah, directly or indirectly, has engaged in acts, practices, schemes, and courses of business that violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17

C.F.R. 240.l0b-5], and Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8]. In addition, Abdullah aided and abetted violations by others of Sections 10(b) and 15(c)(1)(A) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(c)(1)(A)] and Rules 10b-3 and 10b-5 thereunder [17 C.F.R. 240.l0b-3 and 240.l0b-5], and Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

3.     Unless Abdullah is permanently restrained and enjoined, he will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object.

## JURISDICTION AND VENUE

4.     The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)] seeking, among other things, to restrain and enjoin permanently Abdullah from engaging in the acts, practices, transactions, and courses of business alleged herein. In addition to injunctive relief, the Commission seeks: (a) a final judgment ordering Abdullah to disgorge his ill-gotten gains, with prejudgment interest; (b) a final judgment ordering Abdullah to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and (c) such equitable and other relief as the Court deems just, appropriate or necessary for the benefit of investors [15 U.S.C. § 78u(d)(5)].

5.     This Court has jurisdiction over this action, and venue lies in this District, pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Sections 21(d) and 27 of the

2

Exchange Act [15 U.S.C. §§ 78u(e) and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. Abdullah, directly or indirectly, has used the mails and the means and instrumentalities of interstate commerce in connection with the acts, practices, transactions, and courses of business alleged herein, many of which occurred in this District.   In addition, Abdullah transacted business and maintained offices in this District throughout the relevant period.

**DEFENDANT**

6.      **Aamer Abdullah**, age 34, resides in New York, New York.   Until earlier this year, Abdullah was a managing director at ICP and previously served as the head of its asset-backed and mortgage-backed securities desk.  Abdullah reported directly to Priore.  Abdullah was registered as an associated person of ICPS from June 2006 to April 2010.

**OTHER RELEVANT ENTITIES AND INDIVIDUALS**

7.      **ICP Asset Management, LLC (ICP)** is a Delaware corporation headquartered in New York.  ICP is engaged in providing investment and trading advice relating to various structured fixed income instruments, including mortgage-backed bonds and other asset-backed securities.  ICP has been registered with the Commission as an investment adviser since 2006 and is a wholly-owned subsidiary of Institutional Credit Partners, LLC a/k/a or d/b/a ICP, LLC or ICP Capital, LLC ("ICP Holdco").

8.      **ICP Securities, LLC (ICPS)** is a Delaware corporation headquartered in New York.   ICPS is a registered broker-dealer and a member firm of the Financial Industry Regulatory Authority ("FINRA").  ICPS engages in the structuring, origination, trading, and distribution of leveraged credit instruments and primarily conducts riskless principal transactions.  ICPS is a wholly-owned subsidiary of ICP Holdco, which is majority-owned by Priore (through an entity he wholly owns, Founders, LLC).

3

9.     **Thomas C. Priore**, age 41, resides in Chappaqua, New York. Priore is the founder, president, and chief investment officer of ICP and a 76% owner of ICP Holdco (through Founders, LLC). Priore serves as ICPS's president and is registered with FINRA as ICPS's general securities principal and general securities representative.

10.    **The Managed Account** is an investment account for which ICP served as investment adviser since 2007 and over which it exercised discretionary trading authority. The Managed Account was beneficially owned by an important client of ICP and Priore ("Client A").

## FACTUAL ALLEGATIONS

### A.     ICP's Obligations as Collateral and Investment Manager

11.    ICP served as the collateral manager to four collateralized debt obligations known as the Triaxx CDOs: Triaxx Prime CDO 2006-1, Ltd. ("Triaxx 1"); Triaxx Prime CDO 2006-2, Ltd. ("Triaxx 2"); Triaxx Prime CDO 2007-1, Ltd. ("Triaxx 3"); and Triaxx Funding High Grade I, Ltd. ("Triaxx Funding"). The Triaxx CDOs, which were launched in 2006 and 2007, were pooled investment vehicles that issued notes and other debt obligations to investors to raise funds to invest in residential mortgage-backed bonds. Each of the CDOs was an entirely separate entity with distinct investors. Triaxx 1, 2 and 3 were what are typically referred to in the structured finance industry as "cash-flow" CDOs, while Triaxx Funding was a "market-value" CDO.[1] Collectively, the Triaxx CDOs issued more than $11 billion of notes and other obligations.

---

[1]     The most relevant distinction between cash-flow and market-value CDOs is in the effect of changes in the market value of the portfolio of bonds or other assets held by the CDO. In cash-flow CDOs, a change in the market value of this investment portfolio usually does not require any of the assets to be sold. Under the financing arrangements typically employed by market-value CDOs, however, the CDOs are subject to margin calls whenever the market value of their assets declines. To meet such margin calls, a market-value CDO is required to sell assets and, if it cannot do so at sufficiently high prices, liquidate its investment portfolio to satisfy obligations to senior lenders or investors.

12.     In addition to managing billions of dollars in the Triaxx CDOs, ICP served as investment adviser to several hedge funds, the largest of which was known as the ICP Strategic Credit Income Fund ("SCIF"). ICP touted SCIF as a multi-strategy, fixed income, absolute-return fund. In addition, ICP served as investment adviser with discretionary trading authority for the Managed Account. Under an investment management agreement, ICP had the authority to manage the Managed Account's assets, and was entitled to receive certain of the net profits generated by the Managed Account.

13.     To govern its conduct in managing the Triaxx CDOs, ICP entered into investment advisory agreements known as "collateral management agreements." These agreements placed various restrictions on the authority of ICP and its senior investment managers, Priore and Abdullah, to act on behalf of the CDOs. For example, the agreements obligated ICP, Priore, and Abdullah at all times to "exercise reasonable care, using a degree of skill and attention no less than that which [ICP] exercises with respect to comparable assets that it manages for itself, and in a commercially reasonable manner consistent with practices and procedures followed by institutional managers of national standing . . . ." In addition, ICP, Priore, and Abdullah were required strictly to follow all of the terms set forth in the CDOs' indentures, which were the documents governing the CDOs' obligations to their investors.

14.     To further protect the Triaxx CDOs and their investors from improper transactions, ICP, Priore, and Abdullah were required under the terms of the collateral management agreements to conduct all trades on behalf of the CDOs on an "arm's length" basis — i.e., on terms at which unaffiliated parties would freely agree to trade. In setting prices for trades, they also had to seek "best execution" — i.e., to use reasonable diligence to ascertain the best market and to purchase or sell securities at prices that were as favorable as possible to the

CDOs. Finally, if ICP, Priore, or Abdullah sought to sell a security held by a Triaxx CDO, they were prohibited from bidding on that security for the account of any other client of ICP (including another CDO) unless they first obtained "*bona fide* bids" on that security "from at least two other nationally recognized independent dealers." These various restrictions were designed to prevent trades on terms that were unfavorable to the CDOs.

15.     ICP, Priore, and Abdullah were also required to follow certain investment guidelines for the Triaxx CDOs. Among other things, the guidelines prohibited them from causing either Triaxx 1, 2, or 3 from "hold[ing] itself out as being willing to enter into . . . or to offer to enter into . . . [or] assume" any "forward contract" (i.e., an agreement to buy or sell an asset, at a pre-determined price, on a specified date in the future). Because forward contracts could substantially increase the investment risk faced by the CDOs, thereby exposing investors to potentially serious losses in a down market, ICP, Priore, and Abdullah were expressly forbidden by the CDOs' investment guidelines from entering into them.

16.     The CDOs' indentures placed other restrictions on the authority of ICP, Priore, and Abdullah. The CDOs received monthly payments (known as "amortization") as the mortgages backing the bonds held by the CDOs were refinanced, redeemed, or paid down. Although the CDOs were permitted in certain circumstances to reinvest such amortization in additional securities, they could do so only if independent approval for each reinvestment was obtained from certain parties. Specifically, the indentures provided that neither Triaxx 1, 2, nor 3 could purchase securities "without the prior written approval of such investment" by the parties that provided insurance on the CDOs' senior debt notes. For Triaxx 1 and 2, this party was AIG Financial Products Corporation ("AIG"), and for Triaxx 3, it was Financial Guaranty Insurance Company ("FGIC"). In addition, ICP, Priore, and Abdullah were not permitted to reinvest in

additional securities unless the proposed trade satisfied detailed investment criteria designed to ensure diversification of the CDOs' overall portfolios and to preclude investment in risky or poor quality assets.

17.     Finally, to ensure that all trading activity on behalf of the CDOs conformed to these and other criteria, ICP, Priore, and Abdullah were required to make certifications to a third-party trustee that acted on behalf of the Triaxx CDOs and their investors. Before the trustee would accept trades for the CDOs, they had to certify by signing each trade ticket that a given trade complied with all of the investment criteria set forth in the CDOs' indentures, including the obligations to trade on an arms' length basis, consistent with their best execution obligation, and with the consent of AIG or FGIC. When the CDOs were created, ICP "directed [the trustee] to rely" on such future representations that each trade was in compliance with such requirements.

18.     As collateral and investment managers, ICP, Priore, and Abdullah were fiduciaries to the Triaxx CDOs, SCIF, and the Managed Account, and owed to each a duty to act in its best interests. Notwithstanding their obligations, however, ICP, Priore, and Abdullah engaged in multiple transactions that defrauded ICP's advisory clients. Many of these transactions were done to favor one set of ICP clients — Triaxx Funding or the Managed Account — over ICP's other clients, the three Triaxx cash-flow CDOs. Other transactions were made in order to line the pockets of ICP and its affiliates.

**B.     The Prohibited Forward-Purchase Arrangements**

19.     In early June 2007, as a result of the collapse of certain hedge funds under its management, the Wall Street firm of Bear Stearns put up for auction a large quantity of mortgage-backed bonds that previously had been held by its hedge funds. Priore participated in the auction and placed a winning bid for approximately $1.3 billion of bonds. Under a temporary financing arrangement, two major brokerage firms agreed to purchase approximately

7

$1 billion of the bonds and simultaneously forward-sell them to the Triaxx CDOs.  On or around June 14, 2007, ICP committed Triaxx 1, 2, and 3 to forward purchase the bonds from the brokerage firms.  These trades were memorialized in writing, with the settlement dates — i.e., the dates when the CDOs would deliver payment and receive the bonds — set for August and September 2007.

20.     In late June 2007, after having committed the CDOs to the forward purchase of the Bear Stearns bonds from the two brokerage firms, Priore fraudulently altered the transaction to misappropriate approximately $14 million for ICP and its affiliates.  Approximately two weeks after the CDOs forward-purchased the Bear Stearns bonds (but prior to the settlement dates for the bonds), Priore arranged to sell the bonds to another ICP client, the Managed Account, at substantially higher prices.  This trade would have allowed the CDOs to realize a profit of approximately $14 million for the risk to which they were exposed on their investment in the Bear Stearns bonds.

21.     Rather than executing this trade on behalf of the CDOs, however, Priore contrived to misappropriate the entire profit for ICP and himself.  Under his direction, Abdullah and others at ICP asked the two brokerage firms to cancel the trades by which they sold the Bear Stearns bonds to the CDOs and book new trades that listed ICP entities — ICP, ICPS, and/or ICP Holdco — as the purchasers of these bonds.  Once this was done, the ICP entities simultaneously purchased the bonds from the brokerage firms and resold them at the higher prices to the Managed Account, thereby misappropriating for themselves a risk-free profit of approximately $14 million.

22.     By replacing the CDOs with the ICP entities as the purchasers of the bonds, ICP and Priore defrauded the CDOs of a profit that rightfully belonged to them.  If the trade had been

8

done properly, the CDOs would have sold the bonds to the Managed Account and retained the $14 million profit. Moreover, by placing the CDOs at risk of loss on the original trade (by obligating them to purchase the bonds from the brokerage firms at fixed prices even if the market prices of the bonds declined in the future) but depriving them of the opportunity for gain (by seizing for ICP and its affiliates any gains from the sale of the bonds at improved prices), ICP and Priore exploited the CDOs' creditworthiness for their own gain. Although each of the Triaxx CDOs had a board of independent directors, ICP made no disclosure of this transaction to the CDOs or their boards of directors. Nor was the $14 million markup disclosed to Client A.

23.     When Priore sold the portfolio of Bear Stearns bonds to the Managed Account in June 2007, he represented to Client A that he had CDOs with "locked up money" that could acquire the bonds from the Managed Account on a regular basis. At the time, however, Priore viewed this as only one of several options that ICP could utilize in managing the Managed Account's portfolio, and he did not firmly commit the CDOs to forward-purchase the bonds from the Managed Account. It was not until August 2007 that Priore determined to forward sell the entire portfolio of Bear Stearns bonds to the Triaxx CDOs at defined prices. Rather than using the prevailing market prices of the bonds in August 2007, however, Priore used the higher prices at which the Managed Account had acquired them in June 2007, before the market deteriorated. By effectively "back-dating" the forward-purchase prices, ICP and Priore improperly committed the CDOs to overpay for the bonds. In the end, as a result of this prohibited and concealed arrangement, the Triaxx CDOs overpaid for bonds purchased from the Managed Account by at least $50 million.

24.     In entering into these forward-purchase agreements — first with the two brokerage firms, then with the Managed Account — ICP violated its duties to the CDOs in

9

numerous ways.   First, ICP violated the express prohibition against forward contracts in the CDOs' investment guidelines.   Second, ICP committed the CDOs to this arrangement without consulting with, or obtaining the consent of, AIG or FGIC.   Third, ICP failed to inform the CDOs' trustee, as it was required to do, of the CDOs' commitment to forward-purchase the bonds, knowing that as a result the trustee's reports to investors would materially misrepresent the CDOs' true investment risk.

25.    When he finalized the forward-purchase arrangement in August 2007, Priore delivered a schedule to Client A that contained a list of the bonds to be sold to each of Triaxx 1, 2, and 3, the prices and quantities of each bond, and projected dates, between October 2007 and April 2008, for each CDO to purchase its allotted bonds.   Afterwards, as the market for mortgage-backed securities continued to decline in late 2007 and 2008, ICP simultaneously managed the portfolios of Client A and the Triaxx CDOs, executing transactions between these client accounts at its own discretion.   In many instances, ICP, Priore, and Abdullah caused further harm to the CDOs by entirely ignoring the August 2007 schedule.   For example, when one Triaxx CDO was unable to make a scheduled purchase, Priore and Abdullah very often caused another CDO to purchase the bond at the originally-scheduled price.   They did this repeatedly even though the market price of the bond had fallen to much less than the scheduled price, and notwithstanding the fact that the other CDO had no obligation to purchase the bond at the scheduled price and could have purchased the same bond or a similar one for a lower price in the open market.   In this way, ICP, Priore, and Abdullah improperly treated separate investment vehicles (with distinct investors) as if they were a single portfolio, and caused one CDO to bear the loss on a trade that ICP committed another CDO to make.

C.    **Undisclosed $2.5 Million Profit On Same-Day Sale of Bonds to a Triaxx CDO**

26.    ICP, Priore, and Abdullah knowingly directed a purchase by the CDOs through another client account to circumvent an express restriction in the Triaxx CDOs' indentures. In August 2008, Abdullah caused a Triaxx CDO to purchase approximately $22 million of mortgage-backed bonds in the open market at a price of $63.50 per bond, and submitted a trade ticket to the CDO's trustee. (When first issued, a mortgage-backed bond is priced at "par" or $100 but its market price may decline over time.) The trustee rejected the trade because the CDO's indenture expressly prohibited the purchase of bonds priced below $75. This prohibition was designed, among other things, to protect the CDO and its investors by ensuring that ICP did not expose them to the risks of owning highly-distressed bonds.

27.    After conferring with Priore, Abdullah instead caused the Managed Account to acquire the bonds at their prevailing market price of $63.50 per bond and immediately caused Triaxx 2 to purchase them from the Managed Account at a price of $75 per bond. This grossly-mispriced transaction generated for the Managed Account an immediate, risk-free profit of approximately $2.5 million, directly at the expense of Triaxx 2, and fraudulently evaded an express prohibition in Triaxx 2's indenture. No disclosure of this was made to any of ICP's clients or to the investors in Triaxx 2.

D.    **Fraudulent "Swaps" of Bonds**

28.    Beginning in early 2008, Priore and others at ICP directed multiple "swaps" of bonds in the Managed Account to generate profits at the expense of the Triaxx CDOs and to evade the approval procedure set forth in the CDOs' indentures. These swaps were designed to remove bonds from the Managed Account that AIG would not approve for purchase into Triaxx 1 and 2, and replace them with bonds that ICP could argue were approved (because AIG purportedly had approved purchases of such bonds in the past).

11

29.     The swaps consisted of three steps: (a) selling bonds from the Managed Account to the open market, even though ICP had committed a Triaxx CDO to forward-purchase those bonds in the summer of 2007; (b) purchasing from the open market into the Managed Account new bonds that were priced below the original bonds; and (c) causing the Triaxx CDO to purchase the new, cheaper bonds from the Managed Account at the forward-purchase price assigned to the original bonds. ICPS served as intermediary in the swaps of bonds in Seychelles, and in at least one instance a swap was structured so that ICPS could generate an additional, risk-free, and undisclosed profit at the expense of the CDOs. Abdullah, who was aware of the improper swaps and generally implemented the trades between the Managed Account and the Triaxx CDOs, assisted in at least one instance in replacing bonds in the Managed Account as part of what he knew was a swap.

30.     By carrying out the improper swaps, ICP, Priore, and Abdullah caused the Triaxx CDOs to pay forward-purchase prices for bonds that they had never committed to forward purchase, and to acquire bonds that were cheaper than the ones the CDOs actually had committed to purchase at those prices. If ICP, Priore, and Abdullah had wanted the CDOs to acquire the cheaper bonds, they could have made such purchases directly into the CDOs from the open market at prevailing market prices. Instead, they executed the swaps to generate profits at the CDOs' expense.

E.     **Fraudulent Sales to Save Triaxx Funding**

31.     As the mortgage markets began to sharply decline in late 2007, Triaxx Funding received numerous margin calls from the counterparty to its repurchase financing agreement ("Repo Counterparty"). Under the repurchase agreement, the Repo Counterparty regularly marked-to-market the value of Triaxx Funding's portfolio of mortgage bonds and, as the value dropped, demanded that Triaxx Funding post additional capital (referred to as "margin") to

12

protect against potential losses. If Triaxx Funding failed to do so, the Repo Counterparty had the right to seize the CDO's bonds and sell them to satisfy Triaxx Funding's obligations under the repurchase agreement.

32.     To allow Triaxx Funding to raise cash to meet the margin calls, ICP, Priore, and Abdullah caused Triaxx 1, 2, and 3 to purchase hundreds of millions of dollars in bonds from Triaxx Funding at what they knew were above-market prices. Triaxx 1, 2, and 3 thereby overpaid for bonds by approximately $38 million. In addition to improperly favoring Triaxx Funding over the other CDOs, these sales violated the obligations of ICP, Priore, and Abdullah to obtain best execution for all purchases by Triaxx 1, 2, and 3 and to conduct all transactions on an arms' length basis.

33.     Between March and October 2008, ICP caused Triaxx Funding to sell nineteen bonds — each one to another Triaxx CDO, and not once in the open market. For example, on July 28, 2008, Triaxx 3 purchased CMALT 2007-A6 1A1 bonds from Triaxx Funding at a price of $92 per bond, even though ICP, Priore, and Abdullah knew that the prevailing market price for these bonds was substantially lower. (ICP had purchased a very similar bond, CMALT 2007-A5 1A3, on the open market two weeks earlier at a price of $78.63 per bond.) Abdullah submitted to the CDOs' trustee trade tickets for certain of the sales from Triaxx Funding to the other CDOs that falsely represented that such sales complied with the CDOs' investment eligibility criteria in all respects.

34.     Priore knew that the prices of sales from Triaxx Funding were substantially above prevailing market levels, yet instructed Abdullah and other ICP employees to proceed with the sales. After several sales were executed, Abdullah, who felt uncomfortable following Priore's instructions, directed ICP employees to name Priore as the trader in ICP's books and records.

F.    **Cross-Trades at Artificially-Inflated Prices**

35.    Beginning in the fall of 2007, ICP began executing dozens of cross-trades among Triaxx 1, 2, and 3.  Priore, Abdullah, and others at ICP knew that these cross-trades regularly were done at inflated prices.  Within ICP this process was referred to as "rebalancing."  Abdullah played an active role in managing the "rebalancing" process and effectuating the cross-trades.

36.    One of the reasons for these "rebalancing" trades was to generate cash in a CDO so that it could purchase bonds at artificially-inflated prices from Triaxx Funding.  For example, on April 28, 2008, an ICP employee wrote: "we cannot put the bonds from TF [Triaxx Funding] into T2 [Triaxx 2] because they are not eligible . . . .  We need to put them into T3 [Triaxx 3] and then move . . . eligible bonds from T3 out [into Triaxx 2]."  On other occasions, cross-trades were done to generate cash for the purpose of purchasing bonds from the Managed Account at above-market prices.

37.    The cross-trades between Triaxx 1, 2, and 3 violated the obligations of ICP, Priore, and Abdullah to obtain best execution on all trades and to conduct transactions on behalf of the CDOs on an arms' length basis, in a commercially reasonable manner, and, in the case of cross-trades, only after bona fide bids had been received from third parties.  The prices at which the cross-trades were done often vastly exceeded the market prices of the bonds, as Priore and Abdullah knew.  For example, on April 30, 2008, they caused the CDOs to cross-trade tens of millions of dollars worth of WFMBS 2007 bonds at a price of $99.20 per bond, even though ICP acquired the same bonds on the same day from an unaffiliated dealer at $85.16 per bond.  On another occasion, ICP caused the CDOs to cross-trade millions of dollars worth of CMALT 2007 bonds several times at prices ranging from $78 to $99.86 per bond.  In both instances, ICP employees, including Abdullah, were aware that the market price for the bonds was somewhere in the $70s or $80s per bond and not anywhere near par.  In yet another instance, after a Triaxx

14

CDO purchased bonds from Triaxx Funding at the price of $92 per bond, ICP caused the CDO to sell the same bonds to another Triaxx CDO, on the same day, at a price of approximately $96 per bond. Each time Priore and Abdullah submitted a trade ticket for a cross-trade between the Triaxx CDOs, they represented to the CDO's trustee that the trade complied with the vehicle's investment eligibility criteria. Those representations were false.

38.     Many of the cross-trades between Triaxx 1, 2, and 3 were done, with Priore's and Abdullah's knowledge and at their direction, at a price of $92 or above per bond to manipulate the CDOs' "overcollateralization" test. Like other CDOs, the Triaxx vehicles had to satisfy several tests each month before they could reinvest income and pay ICP's fees. Among those was the overcollateralization test, which measures the protection afforded investors by the overall value of collateral bonds. In computing overcollateralization, the Triaxx CDOs' indentures permitted a bond's value to be considered at par (i.e., $100) if the bond was purchased at $92 or above. The "rebalancing" cross-trades usually were done at or above that threshold, and the extra overcollateralization credit that these trades generated caused the Triaxx CDOs to continue their reinvestment period for months after it should have ceased. As a result, ICP earned tens of millions of dollars in advisory fees that it otherwise would not have received and to which it was not entitled.

## G.     Repeated Investments Without Required Approvals and Misrepresentations to Investors

39.     As described above, ICP had to obtain prior written consent from AIG or FGIC for all investments on behalf of the Triaxx CDOs — a procedure that served as an independent check on ICP's management of the vehicles. Nevertheless, Priore and Abdullah repeatedly caused the Triaxx CDOs to invest in bonds without obtaining any approvals.

15

40.     In October 2007, under Abdullah's direction, an ICP employee sought after-the-fact approval for bonds that had been purchased (without approval) from the Managed Account the month before. The employee represented to AIG that the "current market allows us to buy these bonds at significant discounts." The employee did not mention that the price of the bonds had in fact been fixed in the summer of 2007 and was therefore not reflective of the "current market." The employee also failed to disclose that the acquisition of the bonds was not driven by "significant discounts" but rather by a concealed and prohibited forward-purchase arrangement with the Managed Account. After AIG rejected the bonds, Abdullah kept them in the Triaxx CDO anyway.     When AIG later learned of this and complained, Abdullah blamed an "operational oversight" and promised to remove the bonds.     Instead, Abdullah left the unapproved bonds in the CDO for months and continued to purchase other unapproved investments.

41.     In December 2007, Abdullah admitted to AIG that ICP had made additional unapproved purchases and promised to reverse such trades. For one purchase, an ICP employee acting under Abdullah's direction again sought after-the-fact approval by referring to "significant discounts" available in the "current market," and stating that "[w]e are targeting this pool because of sound underwriting and performance." Once again, this was misleading because the bonds were priced at June 2007 levels that did not reflect "significant discounts" or "current market" levels. Nor was ICP "targeting" the bonds because of "sound underwriting and performance" — ICP had already committed the CDO to this purchase months earlier. AIG again rejected the bond, and in May 2008 informed Priore that it was "not able to agree to continued reinvestment" in Triaxx 1 and 2 and that "consent will no longer be given for any collateral." Nonetheless, ICP continued to make purchases for both Triaxx 1 and 2.

16

42. In the fall of 2008, AIG inquired about additional unauthorized purchases at above-market prices. At Priore's direction, Abdullah wrote to AIG that "[w]e bought the assets at market prices." As Priore and Abdullah knew, this statement was misleading because ICP made the purchases at prices that far exceeded the market prices prevailing at the time of the trades. In mid-2008, another CDO investor contacted ICP to inquire about trades at inflated prices. Priore, Abdullah, and others acting at Priore's direction responded with similarly misleading explanations, informing the investor that such trades were part of ICP's focus on "building OC [overcollateralization] . . . by buying some discount securities, and by buying some earlier vintage securities which trade at a higher dollar price but [which] we believe offer a better credit story." It was not until subsequent communications that ICP acknowledged to the investor that the trades were in fact made pursuant to a forward-purchase arrangement.

## FIRST CLAIM
### Violations of Section 17(a) of the Securities Act

43. The Commission repeats and realleges Paragraphs 1 through 42 of this Complaint as if fully set forth herein.

44. As alleged herein, Abdullah, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce and of the mails, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operated or operate as a fraud or deceit upon purchasers of securities.

45. By reason of the foregoing, Abdullah violated, and unless enjoined and restrained will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM

### Violations of and Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5

46. The Commission repeats and realleges Paragraphs 1 through 42 of this Complaint as if fully set forth herein.

47. As alleged herein, Abdullah, directly or indirectly, singly or in concert with others, by the use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated and operate as a fraud or deceit upon purchasers of securities and upon other persons.

48. By reason of the foregoing, Abdullah violated, and unless enjoined and restrained will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

49. As further alleged herein, Abdullah knowingly provided substantial assistance to violations by others of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Abdullah aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## THIRD CLAIM

### Aiding and Abetting Violations of Section 15(c)(1)(A)
### of the Exchange Act and Rule 10b-3

50.     The Commission repeats and realleges Paragraphs 1 through 42 of this Complaint as if fully set forth herein.

51.     At all relevant times, ICPS was a registered broker dealer pursuant to Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)]. ICPS, directly or indirectly, by the use of the means or instrumentality of interstate commerce, of the mails, or of any facility of any national securities exchange, used or employed, in connection with the purchase or sale, or the inducement or attempted inducement of the purchase or sale, of securities otherwise than on a national securities exchange, acts, practices, or courses of business that constitute a manipulative, deceptive, or other fraudulent device or contrivance. By reason of the foregoing, ICPS violated Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. 240.10b-3].

52.     As further alleged herein, Abdullah knowingly provided substantial assistance to ICPS's violations of Section 15(c)(1)(A) of the Exchange Act and Rule 10b-3 thereunder. Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Abdullah aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. 240.10b-3].

## FOURTH CLAIM

### Violations of and Aiding and Abetting Violations
### of Sections 206(1) and 206(2) of the Advisers Act

53.     The Commission repeats and realleges Paragraphs 1 through 42 of this Complaint as if fully set forth herein.

54.     At all relevant times, Abdullah operated as an investment adviser as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to his clients and investors.

55.     As alleged herein, Abdullah, while acting as an investment adviser, directly or indirectly, by the use of the mails or means and instrumentalities of interstate commerce:  (a) with requisite scienter, employed devices, schemes, and artifices to defraud clients and prospective clients; and (b) engaged in transactions, practices, and courses of business which operated and operate as a fraud or deceit upon clients and prospective clients.

56.     By reason of the foregoing, Abdullah violated, and unless enjoined and restrained will continue to violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1)-(2)].

57.     As further alleged herein, Abdullah knowingly provided substantial assistance to ICP's violations of Sections 206(1) and 206(2) of the Advisers Act.  By reason of the foregoing, Abdullah aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1)-(2)].

## FIFTH CLAIM

### Violations of and Aiding and Abetting Violations
### of Section 206(4) of the Advisers Act and Rule 206(4)-8

58.     The Commission repeats and realleges Paragraphs 1 through 42 of this Complaint as if fully set forth herein.

59.     At all relevant times, Abdullah operated as an investment adviser as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to his clients and investors.

60.     As alleged herein, Abdullah, while acting as an investment adviser to pooled investment vehicles, has made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors or prospective investors, or otherwise engaged in acts, practices, or courses of business that are fraudulent, deceptive, or manipulative with respect to investors or prospective investor.

61.     By reason of the foregoing, Abdullah violated, and unless enjoined and restrained will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

62.     As further alleged herein, Abdullah knowingly provided substantial assistance to ICP's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder. By reason of the foregoing, Defendants Abdullah aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Sections 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court grant the following relief:

### I.

A final judgment permanently enjoining and restraining Defendant Abdullah, his agents, servants, employees, attorneys, assigns and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### II.

A final judgment permanently enjoining and restraining Defendant Abdullah, his agents, servants, employees, attorneys, assigns and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, or aiding and abetting violations of, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

### III.

A final judgment permanently enjoining and restraining Defendant Abdullah, his agents, servants, employees, attorneys, assigns and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and abetting violations of Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. 240.10b-3].

### IV.

A final judgment permanently enjoining and restraining Defendant Abdullah, his agents, servants, employees, attorneys, assigns and all persons in active concert or participation with him

who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, or aiding and abetting violations of, Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

## V.

A final judgment ordering Defendant Abdullah to disgorge, with prejudgment interest, all illicit profits or other ill-gotten gains received, and all amounts by which Abdullah has been unjustly enriched, as a result of the misconduct alleged in this Complaint, including his illicit profits, ill-gotten gains, or unjust enrichment, and such other and further amounts as the Court may find appropriate.

## VI.

A Final Judgment ordering Defendant Abdullah to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e)(1) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## VII.

Granting such other and further relief as the Court deems just and proper, including such

equitable relief as may be appropriate or necessary for the benefit of investors.

Dated: June 25, 2010
        New York, New York

By: _____
        George S. Canellos (GC-8092)
        SECURITIES AND EXCHANGE COMMISSION
        Regional Director
        New York Regional Office
        3 World Financial Center
        New York, NY 10281
        Tel: (212) 336-1100

Of Counsel:
        Andrew M. Calamari
        Celeste A. Chase
        Joseph O. Boryshansky
        Susannah M. Dunn
        Joshua R. Pater